A95A1360. CSX TRANSPORTATION, INC. v. SNEAD et al.
(465 SE2d 690)

BEASLEY, Chief Judge.

Snead sued Snap-On Tools Corporation in products liability and CSX Transportation, Inc. under the Federal Employer's Liability Act ("FELA"), 45 USC § 51 et seq. Judgment after a jury trial was for $1,000,000 in damages exclusive of medical expenses, as to which defendants were jointly liable, and $250,000 for medical expenses, for which Snap-On alone was liable.[1] This is CSX's appeal; the appeals of Snap-On (Court of Appeals Case No. A95A1359) and of Snead as to

---

[1] The court granted Snap-On's motion for j.n.o.v. on the medical expenses.

Snap-On only (Court of Appeals Case No. A95A1361) have been withdrawn.

Snead repaired train locomotives for CSX and was injured when a ratchet tool used to tighten locomotive bolts failed. The tool, a large variety known as a "three-quarter inch" ratchet, was manufactured by Snap-On. CSX acquired the tool new and had it engraved for identification before it was supplied to Snead. The ratchet mechanism gave way under Snead's weight, after the first four or five pulls on the handle on its first use on a locomotive. Snead's back was injured as a result. The tool was taken by CSX claims personnel and, after Snead sued, was inspected by Hills, an engineer selected by Snead. The internal mechanism was contaminated by grease or heavy oil which held some small metal slivers in a position that caused the ratchet's ball-and-spring assembly to jam. This prevented the tool's teeth from fully engaging, causing a tooth to break suddenly when pressure was applied. The only appropriate lubricant that should have been present was a light lubricating oil, and the introduction of the heavier lubricant, in conjunction with the metal particles, made the tool unsafe.

Snead contended CSX was negligent in supplying him with the ratchet tool in either of two ways: opening the new tool and inserting an improper lubricant that facilitated its failure, or failing to first test the tool to determine if it was safe.

1. CSX contends the court erred in denying its motion for j.n.o.v. because there was no evidence it placed the contaminants in the tool. It is uncontested that the tool failed and that the improper lubricant and metal particles caused it to do so. Although there was no direct proof CSX placed any contaminant in the tool, there was evidence to support the conclusion.

" ' "(A) motion for judgment n.o.v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. Where there is conflicting evidence, or there is insufficient evidence to make a 'one-way' verdict proper, judgment n.o.v. should not be awarded. In considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict. And this approach governs the actions of appellate courts as well as trial courts." ' [Cits.]" *Kapsch v. Stowers*, 209 Ga. App. 767, 769 (1) (434 SE2d 539) (1993).

In support of CSX's contention that there is no evidence CSX placed the improper, contaminated lubricant in the new wrench, it cites Hills' testimony that the tool's mechanism did not appear to have been previously opened when he made his post-incident inspection. The jury was not obliged to accept this observation as conclusive of the fact. Although Hills gave his opinion on the matter, he also testified there were some scratch marks on the ratchet's cover plate,

but he did not think the marks showed it had been opened. He also testified he started his inspection with the premise that the tool had not been disassembled before his inspection. After Hills had opened and reclosed the cover plate of a different, comparison Snap-On wrench, the same wrench was opened by Burck, another engineer. He testified that, at least as to two of the three screws needed to remove the cover plate, it did not appear the tool had previously been disassembled. Thus, there was evidence allowing the jury to conclude Hills was incorrect in his opinion that the tool had not been opened before his inspection.

CSX did have opportunity to insert the lubricant. Although it was not shown exactly when the tool arrived at CSX's repair facility, it was undisputed it had been in its storeroom or in a locker at the toolroom for a few weeks. Snead's foreman testified he was advised by Snead, or Snead's co-worker, that the 3/4-inch ratchet would be needed and that he had then gotten one from the toolroom manager. His testimony in court was that he took it to the toolroom machinist to be engraved with identifying information before taking it to Snead; he described the engraving process, which took just a few minutes, and said nothing else was done to the ratchet by the machinist. However, he had testified during his earlier deposition that he did not remember getting the tool engraved or whether it was already engraved when he picked it up; this was also in evidence.

Although the toolroom machinist did not appear at trial, other CSX workers testified the machinist would occasionally relubricate tools as needed. Relubricating the tool would not be completely unreasonable; the tool's instructions included a direction to periodically open and relubricate the mechanism with a light oil. CSX did use a heavier lubricant to relubricate at least some of its ratchets. When the ratchet was brought to Snead, it was not in a sealed, labeled Snap-On box, but loose in a larger box.

Snap-On's chief engineer testified that the contaminated lubricant could not have been placed in the ratchet during the manufacturing process, that its location was indicative of someone trying to reassemble the ball-and-spring mechanism without the proper tools or experience, and that everyone in Snap-On's assembly process had the proper tools and experience. CSX's electrician, who ordered tools and supplies, testified that when CSX's machinists performed the operation, they would use "a little old thin piece of metal, something like spring steel that was real thin, . . . to hold it in place and then put the pawl in it."

A new Snap-On ratchet wrench, examined for comparison, showed it also had some metal fragments in its mechanism, but it had no heavy oil or light grease. It was Hills' opinion that the filings caused the mechanism to jam, but the presence of the heavier oil or

grease supplied the material needed to hold the filings in that position. He believed the metal filings were produced in the manufacturing process and came from the cover plate. Consultant engineer Burck also examined the heavier lubricant and described it as "used grease," probably added after the tool was manufactured, and contaminated by metal pieces and other material.

Clearly, the contaminated lubricant was introduced into the tool somehow. Even if the jury found Snap-On had manufactured the ratchet with metal particles inside, it could also have found CSX's addition of a heavier lubricant contributed to the cause of the tool's failure. There being evidence to support such findings, the court did not err in denying the motion for j.n.o.v.

2. CSX contends the court should have granted a directed verdict because FELA does not impose a duty to inspect or test a new tool.[2] Under FELA, " 'the employer has a duty to provide the employee a reasonably safe workplace which includes safe conditions, tools, facilities, and supervision. (Cit.)' [Cit.]" *Bowles v. CSX Transp.*, 206 Ga. App. 6 (1) (424 SE2d 313) (1992).

CSX contends that FELA imposes no liability unless the employer is negligent and that neither FELA nor Georgia law requires an employer to test a new tool that does not appear defective. CSX contends there can be no such duty because the employer can be deemed negligent only as to foreseeable injuries, and it is not foreseeable that a new tool will fail. It also contends it can rely on the manufacturer to properly construct the article. The cases it advances to support this position concern a retailer's liability to a purchaser, not an employer's duty under FELA. *Snowden v. Waterman & Co.*, 105 Ga. 384 (31 SE 110) (1898); *Washburn Storage Co. v. Gen. Motors Corp.*, 90 Ga. App. 380 (83 SE2d 26) (1954); *Rupee v. Mobile Home Brokers*, 124 Ga. App. 86 (183 SE2d 34) (1971). CSX's duty to its employee is, of course, non-delegable. *CSX Transp. v. Franklin Indus.*, 213 Ga. App. 778 (445 SE2d 861) (1994).

" ' " 'In order for a party to be liable . . . for negligence, it is not necessary that he should have been able to anticipate the particular consequences which ensued. It is sufficient, if in ordinary prudence he might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might result. (Cits.)' " [Cit.]' [Cit.] ' " " 'The mere fact that a particular kind of an accident has not happened before does not . . . show that such accident is one which might not reasonably have been anticipated.' " ' [Cit.]" *Gilbert v. CSX Transp.*, 197 Ga. App. 29, 31 (397 SE2d 447)

---

[2] CSX also argues the court erred in giving a jury charge on this issue, but appellate review is waived by CSX's failure to object or take exception to the charge. OCGA § 5-5-24 (a); *Crawford v. Presbyterian Home*, 216 Ga. App. 54, 55 (2) (453 SE2d 480) (1995).

(1990). " 'Under (the FELA) the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.' " Id. It was uncontested that a failing 3/4-inch ratchet would be dangerous to its user.

CSX does not cite any case to support the assertion that the FELA duty to provide safe tools cannot include a duty to inspect or test a new tool under some circumstances nor that such an injury is not foreseeable as a matter of law. Questions of negligence, including foreseeability, are ordinarily for the jury. *Wade v. Mitchell*, 206 Ga. App. 265, 268 (4) (424 SE2d 810) (1992). Neither *Peyton v. St. Louis SW R. Co.*, 962 F2d 832 (8th Cir. 1992), nor *Brown v. CSX Transp.*, 18 F3d 245 (4th Cir. 1994), alter the employee's duty or the jury's role. The court did not err in denying the motion for directed verdict.

3. The next enumeration of error is that even given a duty to inspect or test the tool, there is no evidence that any test of the new tool would have revealed the defect, so that the court erred in denying CSX's motion for directed verdict.[3]

Although the plaintiff in *Peyton*, supra, cited by CSX, presented no evidence about the test the employee contended should have been applied, here there is evidence from which the jury could infer a test of the tool could have prevented the accident. Snead's supervisor testified that torque testing could be performed on a new wrench to determine if it would be adequate to tighten the bolts on a locomotive. A directed verdict was not warranted on this issue.

4. Lastly, CSX contends the court erred in denying its motion for new trial on the ground the $1,000,000 jury award was excessive because there was evidence Snead would have been unable to continue work, regardless of the injury sustained, due to a degenerative back condition.

" 'Questions concerning the proper measure of damages in FELA cases, like questions of liability, are to be settled according to general principles of law as administered in the federal courts. [Cits.] . . . [T]he damages recoverable under the FELA on account of a railroad employee suffering injury or death on the job are compensatory only and . . . punitive damages are not recoverable. [Cit.] . . . [T]he jury's determination of the amount of damages to be awarded is otherwise inviolate, "absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial. . . . (Cits.)" [Cit.] This standard of review is consistent with that [of] Georgia law,

---

[3] CSX also enumerates error as to the jury charge on this issue, but its failure to object or take exception waived review. OCGA § 5-5-24 (a); *Crawford*, supra, fn. 2.

[viz]: "Before the verdict will be set aside on the ground that it is excessive, where there is no direct proof of prejudice or bias, the amount thereof, when considered in connection with àll the facts, must shock the moral sense, appear 'exorbitant,' 'flagrantly outrageous,' and 'extravagant.' 'It must be monstrous indeed and such as all mankind must be ready to exclaim against at first blush.' It must carry its death warrant upon its face." [Cits.]' [Cit.]" *Southern R. Co. v. Montgomery*, 192 Ga. App. 308, 311-312 (3) (384 SE2d 907) (1989).

At the time of trial, Snead was 43 years old. An economist testified that a present lump sum of $665,870 would be needed to replace the income and benefits Snead would have received up to a retirement age of 61. Snead testified he was in constant pain, could no longer perform the only work he had ever done because of the pain, and had been forced to severely alter his lifestyle due to the pain. Physicians testified his pain is permanent, as are his limitations; he is not to lift over thirty-five pounds or bend more than four or five times an hour. One physician did testify he would have placed Snead on these work limitations regardless of the injuries suffered in the accident because of a degenerative disk condition. However, he also attributed all Snead's pain to the accident and placed the limitations on Snead's movements because of both the pain and the degenerative condition. Given the evidence presented, the jury's verdict was not so excessive as to shock the judicial conscience.

*Judgment affirmed. Pope, P. J., and Ruffin, J., concur.*

DECIDED NOVEMBER 16, 1995 —
RECONSIDERATION DENIED DECEMBER 18, 1995 —

*Casey, Gilson & Williams, Matthew D. Williams, Sandra Gray*, for appellant.

*Burge & Wettermark, Michael J. Warshauer*, for appellees.

